The moderator for the panel this morning is Parks LLC v. Tyson Foods and Hillshire Brands Company. Good morning. May it please the court. My name is Jeffrey Lewis of Eckerd Siemens. I'm here on behalf of the appellant, which is Parks LLC. This is an appeal from an order granting summary judgment on two counts, one for false advertising and the other for trademark infringement granted in favor of the appellee, which I'll refer to as Tyson Foods and Hillshire, which is a wholly owned subsidiary of Tyson Foods. Let me mention, for years in the late 1970s, 1980s, I fed my kids Park Sausages and I loved the television commercial, Can I have some more Park Sausages, Mom, please? And my kids would say the same thing to me when I was feeding them breakfast, Can we have more Park Sausages, Mom, please? So that is indelibly etched in my memory when I think of Parks and it makes me think of this case in a different way than perhaps comes out in the briefs and I will try not to be swayed by my recollections. Your Honor, it has changed ownership since those days, but the sausage is being manufactured in the same plant in Baltimore as it was during those years. Does Parks manufacture those sausages or do they do anything other than merely own them? At this point, Your Honor, may I reserve three minutes? Yes, sir. At this point, they license the name to two other entities. One is Dietzen Watson and the other is Super Bakery and it is those entities that actually sell the product at this time. I understand that, but does Parks LLC have any role in the manufacture of the product? Not at this point other than they monitor the quality and pursuant to the terms of the license agreements, they have the right to monitor the quality and they do. Putting aside for right now the distinction that you seem to consider a Jesuitical one between the hot dog and the sausage, would you please explain your false advertising claim and why this is not, as the district court suggested, really at heart a false association claim? Why do you have the A1B claim here at all? Because the infringing or the competing trademark is Parks Finest and the finest has been disclaimed, so this really is Parks versus Parks. You're not really attacking quality here in any way as the word finest would suggest. You're not suggesting that it is not truly finest. If I understand your theory throughout, it is that what Tyson has done is to effectively utilize your name to suggest somehow that Parks Finest is actually Parks without the apostrophe. That is correct. We're saying that this is both literally false because it's suggesting that it is one, Parks product and two, it is Parks Finest product and it's neither a Parks product whether it be its finest or otherwise. But isn't that association when you're saying it's not Parks? No, we're saying that that is false advertising because it is literally false. It's only literally false because you are saying it makes an association. You can't get to falsity on that unless you take the step you just assumed, which is that people will believe it means us. In other words, it's a trademark infringement claim dressed up as a false advertising claim. Because without that intermediate step, there's no falsity, right? The problem here is that we are saying that Parks is saying that's us. We understand that. As I suggested from the outset, it seems that your A1B is a mere redundancy. Why is that not the case? Well, we're suggesting that this is actually both under B. I know. And also as trademark infringement. And the district court felt otherwise, right? Right. And it's only the district court that has suggested that. Our opponent did not suggest that. Well, you also are suggesting that somehow the district court improperly raised this sua sponte. How is that improper? I believe this court has condoned such action in the past. Well, we're saying it's improper because we were pursuing a false advertising, not a false association claim. We had our reasons why we wanted to couch it as a false advertising claim. Sure, but if your reasons aren't good, the district court doesn't have to stand mute and say, I mean, if you drag a cat into court and say it's a dog, the district court is not responsible for how you want to label it. It's responsible for figuring out what's going on. And the question is still in front of you. How can you say that a statement Parks is literally false without the assumption that consumers are associating that with your Parks? That's essential to the assertion that it's false, isn't it? I don't think it is essential because Parks is Parks. Wait, so you're saying anybody, any place who says Parks means your sausage company? Well, when they're talking about a similar product to ours. What's the point of having an association claim if it's the same as an advertising claim? In essence, you're saying that you can make a claim under either advertising or association when you say that they're trying to claim that what they call Parks is really your Parks. Well, it's subject to different criteria, different standards, and we chose to characterize this as a false advertising claim for that reason. I'm still a little puzzled by it, but assume you could do this. There's a survey. You put the survey out. The survey, as the district court saw it, had some serious problems because the survey seemed to go to the question of likelihood of confusion and only likelihood of confusion. And not whether it was a strong mark at all. But you used the survey to support your claim both under A1A and under A1B. Well, we weren't asserting the claim under A1A, only A1B, but we were using it both to support our claim under A1B and also our claim for trademark infringement. Right. And so if you set up a survey which is designed to discuss likelihood of confusion, that is the classic question in a trademark infringement claim, right? It is. Okay. How does that translate into literal falsity and a false association claim? If your only evidence is likelihood of confusion evidence, how is it that you cannot be understood to be making it purely a trademark claim, not a false advertising claim? Because it's also addressing an element that is under a false advertising claim, which is whether or not it's deceptive. Okay. I guess we're just running in circles here. Maybe you could show me in the record where it is. It may be there, and I just didn't pick up on it. Let me ask, how can it be deceptive if one of the marks is unknown? You are assuming that both marks are known, and I think that's one of the big problems the district court had in it, that you jumped step one, and you really needed to find out, first of all, whether any of these marks were recognized in and of themselves. Well, at this point, Park's Finest markets on a national basis, spending thousands of dollars in advertising. They're certainly known. My client, that name has been used in this field since 1951. But you're assuming that it's known, and the district court is saying you can't pass that step. You've got to establish that knowledge before you can go on and say, what do you make of these marks? Are two of them connected? I would not agree with that. I think we can deal with it as a given that both of these marks are known. You don't have to establish the validity of your mark? No, we have to establish the validity of our mark, but I would submit that we have done that. If you have to establish the validity of your mark, having had the trademark registration lapse, you have the responsibility of showing that a mark which is primarily a surname has secondary meaning, don't you? For purposes of the trademark infringement, absolutely, yes. Well, for purposes of the false advertising, in order to show, even if we were to accept your assertion that the association can become an element of a false advertising claim, in order to show that there's some association there, you'd have to show that people had secondary meaning for your mark, right? For trademark infringement, yes. Well, no, stick with me. Even if we were to accept your logic, you'd still have to show that people, when they heard Parks, thought of your company. In other words, that there was secondary meaning, right? For trademark infringement, yes. I'm sorry, I'm not communicating very well. How can there be any association? Leave the trademark infringement piece aside and focus on what you seem to want to focus on, false advertising. How can there be any confusion, as Judge Roth was pointing out, unless your mark is known, that is, there's secondary meaning? I would suggest that, in this context, the existence of deception is the same as, in the trademark end, a finding of secondary meaning. Yes, so you'd have to have... And we cited the Lapp case in support of that proposition. So you'd have to have secondary meaning, right? We say that we have established that from the survey and from the various... Explain how the survey supports that. The survey supports that because it shows that there is confusion between these two marks. What is the confusion that it shows? Explicitly, what does the survey say the respondents said when shown the two packages? They are suggesting that a rough one in five people who took the survey believe that they are the same company or affiliated with each other. How does that help you? How does that support what I understand to be your theory of liability here? Because, for purposes of unfair advertising, it shows that there is a portion of the public that are being deceived. And that's the false advertising claim. Can I ask one other question, please? This is something I've been trying to elicit. You've made a statement that your client monitors the quality of these. I saw some statement that Superbaker might do some monitoring. Is there anything that your company does to monitor the quality of these things? Well, Sethi Harris, who is an owner, one of the owners of Parks, he's also, I believe, an owner of Superbakery. They're related companies. It's his responsibility to test the products on a periodic basis. And that's in the record? And that's the record, yes. Okay. Do you know where, by the way? Well, if you don't have it ready to hand, I won't hold you to it. But it is in the record. There's a declaration by him, and there's also a deputy. He was deposed in this case, and that's part of the record as well. Okay. Thank you, Mr. Lewis. Thank you, Mr. Lewis. We'll have you back on rebuttal. Mr. Duffy? Good morning, owners. Just to pick up where my friend left off with respect to the monitoring of the plaintiff's alleged monitoring of the use of Parks by its licensee, the record actually shows that they don't monitor the quality of the product. The only time they look at the quality of the product is after the fact basis, after the product's been produced, and every now and then they stop it. And what's wrong with that? Well, because that's under the law and under the cases that we cited, that's insufficient to show to carry out the licensor's burden to control the quality of the product because it's essentially placing the quality of the product in the control of the licensee's hands. Under DOTA laws, you've got to get out there and see what it's like, but if you're testing the product afterwards and it's of suitable quality, it meets the taste and other standards that the owner thinks is appropriate, that should be sufficient, shouldn't it? But we would disagree with that. Again, the district court never made any findings on this, as you know, Your Honor. We raise this as a possible alternative grounds upon which the court can affirm the district court. You don't need to hang your hat on it. Right. We would respectfully disagree with that. We think under the case law that we cited, I believe it's the Eva's Bridal case, that says that you can't do inspections post hoc. Eva's Bridal is, yeah. Let's get into the secondary meaning here for just a minute. This was, as Judge Roth pointed out at the outset, a very, very well-known mark in the 60s and 70s. I hate to admit, I remember those heads really well, too. At one point, it clearly had to have enough secondary meaning to make it onto the principal register, right? Well, Your Honor, in this case, this case is basically about a failure of proof, with the plaintiff coming forward with sufficient proof to show secondary meaning. So back in the 60s and 70s. So my question to you is, they had secondary meaning at one point, right? But it could not have gotten on the principal register. All we know is that the United States Patent and Trademark Office determined in the 1970s that their mark had acquired distinctiveness. That's correct. As of that date. Okay. So does that proof that the USPTO had decided they had secondary meaning, albeit in the 1970s, does that continue to have salience? Is it significant that it had it at one point? Does that make it more likely? Is it relevant to the inquiry, whether they've got it or shown it now? As we pointed out in the brief, Judge Jordan, the issue before the court, before Judge Leeson, is whether as of the date that my client began selling the allegedly infringing products, which was in January 2014, throughout the country, whether Parks could come forward with sufficient evidence to show as of that date in 2014, not in 1970, but in 2014, that the mark had acquired secondary meaning in the marketplace. And Judge Leeson found, based on the record, that there was simply an absence of admissible evidence to show that they had created, that the mark, in fact, had acquired secondary meaning. And this is important. You moved to cancel the mark, right? That's incorrect, Your Honor. So basically in PTO what happened was the plaintiff at one time owned approximately four different registrations, I believe, for Parks and then more Parks sausages, please, and a couple other registrations. The company had fallen upon hard times and had declared bankruptcy in 1996, and over time those four registrations expired on their own. We did not move to cancel those registrations. They expired because the plaintiff decided not to renew them. But in the briefs they talk about after they expired, then Tyson went in and canceled. Yes, Your Honor, and just to make sure, this is crystal clear. I want to make sure, Judge Roth, that you understand this because this is very important. We cite a case for this in our brief that at the time that we first learned of that registration, which at that time, this was in July of 2013, at that point in time,  and the renewal was actually due to several years before that date, and the PTO had simply, as a ministerial error, had forgotten to mark cancel on the registration. Did you move to cancel the mark? Not whether it had expired already. My question is a pretty direct one. Did you file a piece of paper with the PTO saying cancel the mark? No, we did not. What did you file? The counsel called the PTO and told the PTO, this is my understanding, this registration that's existing expired two years ago because there's no evidence that any renewal was filed, and the PTO forgot. So your understanding is that your side merely brought this attention of expiration to the attention? Absolutely, Your Honor. That's all that happened. Absolutely, 100%. That's what happened in the PTO. The purpose for doing that was because you wanted to make sure the field was clear, right? The only reason you had any interest in it was because you thought that that trademark could be an issue for us, right? Well, I think I was not counsel then, and I don't know if any of this is in the records, so I'd be speculating, but what would be the reason? I mean, I'm sure Hillshire, Tysons, and everybody, they've got enough to do. They're probably not just patrolling the PTO register out of the goodness of their heart. This was done because your client had an interest in making sure there was no potential problem on the register, right? I would suggest, Your Honor, that that is a permissible influence for what happened. That's correct, Your Honor. And I guess it's possible that sometimes the PTO records are not perfect. It's possible that maybe a renewal had been filed, but it just hadn't made – it had been filed two years earlier when it was due, but it just hadn't been marked on the PTO online system, and so they were calling to just make sure that there wasn't a renewal that was overlooked. But there's no dispute in this case, Judge Jordan, that they did not file renewal. They intentionally did not file renewal. They intentionally didn't file it? That's right, Your Honor. They had these records, these PTO, these registrations were in the custody of the plaintiff, and the plaintiff knew of the deadline, so that's what the record evidence is. It knew of the deadline, but it didn't renew the registration. And even without the registration, they can make a claim, whether it's a sound one or not, but they can assert a claim for false designation of origin under Section 43 for an unregistered mark. Absolutely, Your Honor. Okay, and they don't get the benefit of the presumption of the validity of the mark, et cetera, but if they've got secondary meaning and they can demonstrate that, then they're moving toward the proof they have to carry, right? That's correct. Secondary meaning is a question of fact. Given the long history of the mark and the strong advertising impressions made some time ago, why wouldn't this have been the kind of question that a jury ought to wrestle with instead of a judge determining on summary judgment? Yes, Judge Jordan. We covered this a little bit in our brief, so I want to elaborate here. The critical thing to look at here is the first issue on proving secondary meaning for an unregistered mark, you have to prove it at the time that the defendant started using its allegedly infringing mark, so that's January 2014. And you also have to prove it, the plaintiff has to prove it in the geographic area in which the plaintiff contends that it has secondary meaning, okay? So in this case, Your Honor, the plaintiff alleged that it has secondary meaning in the, quote, unquote, Eastern United States, which it defined as 25 states and the District of Columbia. That was its claim of secondary meaning. So the district court then, with that claim of secondary meaning, it then went through, ticked through the evidence that this court's commerce court case says that it should consider, ticked through the evidence to see if there was sufficient evidence to show that in the Eastern United States, as they define it, the mark had acquired secondary meaning. And the Eastern United States, as they define it, at least in your view, everything east of the Mississippi. Yes, Your Honor. And that's what the district court found, and that's what they argued below, it's what the district court found, and they argued it again on appeal. Okay? So that's the frame of reference. Not in 1970, not in 1960, not in the 80s. In 2014, in the Eastern United States, that's just 25 states, 25 states plus D.C., did the mark, did the parks mark have secondary meaning in the marketplace? And the district court found, and properly so, they failed to offer sufficient evidence to show in that geographic market, in that 25 states that they define, they've reiterated the argument on appeal, that it had secondary meaning. And it was perfectly proper to do that because, one, there was virtually no evidence of any advertising. They had approximately $14,000 of advertising in the record on an annual basis for approximately seven years. True enough, but they're not, I think their position is, and you should speak to it, is that we had established the mark through extensive advertising, and then we stayed on the market. We're on the shelves all over these places, and we've got handbills, and we've got promotions that are not TV advertising, but they are continually putting the name in front of the public. Is there a legal basis for saying that you've got to be on television, or you've got to be on radio, in order to maintain your secondary meaning? A couple things. First of all, just to be crystal clear, when they said they were on the market, I was going to get to this next, but Your Honor, they were selling, there's no evidence in this record that they were even selling the product, or that they were using the mark in approximately 80% of their states. If you just look at that right there, they have no use in those states, in 80% of this portion that they define, Eastern United States. They have no advertising in 80% of that portion of the Eastern United States. That right there shows you, as a matter of law, they cannot establish secondary meaning in what they describe as their geographic market, that they have secondary meaning in the Eastern United States. Now, to answer your question, Judge Jordan, they argued, well, they didn't have to do advertising, and then they cite, in support of that, they cite the case from the Second Circuit, the Morningstar case. The Morningstar case is different than this case, because in the Morningstar case, the plaintiff had a valid mark. When the court there was analyzing whether or not the plaintiff's mark was strong in that case, for purposes of likelihood of confusion, it mentioned in passing, oh, well, they may not have had to do advertising because the mark was already being sold in the marketplace. But in this case, that's the whole dispute. And that is, the issue is, and it was found there wasn't a genuine dispute. The issue is, did that mark have secondary meaning in that marketplace in 2014? And the court found that it did not. And to suggest that it shouldn't consider it, that improperly considered the abject failure to come forth only negligible advertising dollars, would conflict with a long line of cases from this court that express the whole, that you need to consider the level of advertising in determining whether or not a mark has secondary meaning. So absolutely, the court properly found and properly considered that their failure of advertising was one of many failures on their part to come forth secondary meaning in, again, the eastern United States. That's a 25-state region as of not 1960, not 1970, not 1980, but as of 2014. There's no evidence of that in the record. The only evidence is... Is there something about the confusion evidenced in the survey that should be troubling about whether there's a fact question? No, absolutely not. And I thought the questions that were put to my friend, I think, get right to the heart of the matter. For them to show either false advertising or trademark infringement, they have to prove that people know of their mark, of their product. And the problem with this survey, with their survey, in trying to pull, as the District Court Judge Leeson said, double duty with their likelihood of confusion survey, is that that format of a survey expressly informed the respondents of the existence of the plaintiff's mark when that was the whole purpose of the inquiry in the first place, is to see, do respondents even know of the plaintiff's mark? So a typical secondary meaning survey comes about when you would ask, do you associate Park Sausage with one company or more than one company? It's not showing people the plaintiff's product, which assumes the existence that they already know, which then tells them a fact that they may not have known, and then say, oh, wait, that shows somehow that there's secondary meaning. And this is important, too. Judge Leeson very carefully analyzed these issues, and he expressly found that that survey presumes the existence of secondary meaning. And if you read the plaintiff's brief in this case, the briefing closely, they don't dispute that. They don't say he was wrong in doing that. Let me ask you a quick question. If a mark has been very strong in the past and lives on in the memories of certain people who fed sausage to their kids for breakfast for years, the fact that there is no longer advertising, the fact that there is lingering in the memories of many people knowledge of this mark, is that a factor that might counterbalance the lack of current advertising? Well, let me say, Judge Roth, that's a good question. I will point out there's no evidence in the record of the type that you just pointed to, of this kind of lingering confusion or lingering recognition. And that's the problem. There is no evidence in the record. They could have gone out. They knew this was an issue from the very beginning when the district court denied their motion for preliminary injunction because it could not show that consumers associate parks with their product. So they knew they needed to go out and get a survey. They knew they needed to go out and find and show that people today, or as of 2014, associate parks with the plaintiff. Thank you, Mr. Dabney. I think we understand your position. I have another quick question. The other thing I was going to say is obviously Dr. Lange needed to have more Jane Roth stickers. I know. I live down in D.C. now, so they never found me. They didn't find me either. But Tyson talks about sausage market in the Northeast and the sausage market in the Mid-South, and in neither of those categories is the state of Delaware included. And so my question is, what's the matter with the state of Delaware? I'm not sure. To be quite honest with you, Your Honor, I believe that the reference that we are citing there is a commercial database that shows market share by certain states, and I believe that we should take that up with that database as to why they would omit the good state of Delaware from that. Thank you very much, Mr. Dabney. Before the rebuttal of Mr. Lewis, I will say that the only sharp word I think I have ever heard directed to me from Judge Roth, in the almost 30 years I have known her, was one occasion when I said, intending it in a jocular fashion, that Delaware was merely a suburb of Philadelphia. Also note that she's not the only judge sitting up there who's from the state of Delaware. That's correct. There you go. There's two points, and I'll wrap it up. First of all, it's not Morningstar case. It's the Morningside case. I'm not carping on that, which is at 182 F. 3rd, 133. And at page 139, the court states, and I quote, although evidence of advertising can bolster a mark's strength, its absence need not weaken the mark. Close quotes. But their point is, and it's one that would be helpful if you spoke to, Mr. Lewis, is that that's a case where there was a mark. Here, in order to establish you even have a mark, since you let the registration lapse and it can't be presumed, you've got to show the secondary meaning. I agree. It's your responsibility to do that, and so this Second Circuit case is really in a posit. Your response? I agree, and I submit that the record that we have produced here meets that burden. The other point I wanted to make is that this mark has been used continuously since its inception in 1951, and just to give you an idea. Hold on just a minute. Sure. They say, and it would be helpful for you to respond to this, you say it's been used, but in fact, in the record, for 80% of the places where you claim market penetration, you've got no evidence of market penetration. Do you have a comeback to that? I do. I was going to point out just by way of example that between 2008 and 2014, when the park's finest mark entered the scene, Dietz sold over $38 million in sales of products using the park's trademark. That's their point. They're saying you've made a claim, you've made a geographic claim, you've got no evidence in the record that you've sold one sausage patty in 80% of that region, and that undermines your claim in total because you don't show where you've done any of this. Where is Dietz's penetration, and what does the record show with respect to that? First of all, I disagree with the characterization of 80%, but also we have included declarations which are part of the record here that talk about sales all over the eastern part of the United States. Thank you. Thank you, Mr. Lewis. Because this argument began with Judge Roth's disclosure, I guess I should make one of my own. I could not pass up noticing in the record, and I say this as a lifelong Penn State football fan and Steelers football fan, the name of Franco Harris and Lydell Mitchell. That was of considerable interest to me. Their association with your client is what? They are the owners of Parks LLC. It has nothing to do, of course, with the merits of the case, but Mr. Harris and I share a very, he wouldn't know this, but we share a very good personal friend by the name of Ronnie Rossi, and I will have to tell my friend when I see him next in the neighborhood that I heard of his case. Talk about an over some sausage. Mr. Harris knows very well who I'm talking about. In view of the fact that you grew up in the western part of Pennsylvania, I had a feeling you would catch the name. Yes. Well, that and a Del Grosso spaghetti sauce that I think would figure in the recollection of Mr. Harris as well. Thank you. Thanks. Thanks very much. Thank you, gentlemen, very much. We'll take the case now.